[No. S099938. June 27, 2002.]

SANDRA G. MUSSER, Cross-complainant and Appellant, v.
DOUGLAS PROVENCHER et al., Cross-defendants and Respondents.

## COUNSEL

Murphy, Pearson, Bradley & Feeney, James A. Murphy, Harlan B. Watkins and Alexander J. Berline for Cross-complainant and Appellant.

Stephan, Oringher, Richman & Theodora, Harry W. R Chamberlain II, Robert M. Dato and Brian P. Barrow for California Society of Certified Public Accountants as Amicus Curiae on behalf of Cross-complainant and Appellant.

Lanahan & Reilley, Christopher R Miller, Cheryl P. Martinsen and Noreen M. Evans for Cross-defendants and Respondents.

## OPINION

**BROWN, J.**—Two questions are presented by this case. ■ The first question is whether considerations of public policy require the adoption of a blanket rule barring *concurrent counsel* or *cocounsel* from suing one another for indemnification of legal malpractice damages. We conclude public policy does not require the adoption of such a blanket rule. The second question is whether insurers of attorneys sued for legal malpractice may be *subrogated* to the attorneys' indemnity claims against concurrent counsel or cocounsel. While legal malpractice claims are not ordinarily assignable, we conclude the policy considerations against assignment are not applicable here.

For the reasons stated, we affirm the judgment of the Court of Appeal, which had reversed the judgment of the trial court granting a nonsuit.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

Sandra G. Musser is an attorney who practices family law. She represented Pam Scott in divorce proceedings in 1992. Musser filed a petition for spousal and child support set to be heard on July 17, 1992. At that hearing, Scott's husband declared that he had filed for bankruptcy and the support hearing was continued. Musser arranged for [] Douglas Provencher, a bankruptcy specialist, to obtain relief from the automatic stay imposed by the bankruptcy court.[2] Provencher did not obtain relief from the stay, but advised Musser that she could proceed with the hearing to set support. Provencher advised Musser that the support hearing would not violate the stay if the court did not enter the support order until after the stay was lifted. This advice was contrary to well-established legal authority. Musser asserts Provencher did not even attempt to research the issue. Acting on Provencher's advice, Musser continued with the hearing, although the family law judge warned her she might be violating the automatic stay in so doing.

Thereafter, Mark Scott appealed the grant of spousal and child support and in an unpublished opinion [], the Court of Appeal reversed the support awards on the grounds they were void *ab initio*, as the hearing setting support violated the automatic stay.

Facing punitive damages for violation of the automatic stay, Pam Scott settled with her former husband for less than the original support order. She then sued Musser for malpractice and breach of contract. Musser cross-complained against Pam Scott for past-due attorney fees and costs. Musser moved for summary judgment on the ground that Scott had not sued the sole negligent party, Provencher. The court denied Musser's summary judgment motion, finding Musser was vicariously liable for Provencher's negligence.

Musser requested that Provencher and his insurance carrier contribute to a settlement offer to Pam Scott, but Provencher refused. Musser then filed a cross-complaint against Provencher for indemnity and settled the case with Pam Scott. Mark Scott also filed a complaint against Musser for her part in

---

[1]We adopt the Court of Appeal's statement of the factual and procedural background. No party petitioned for rehearing to suggest that the Court of Appeal omitted or misstated any material fact. (Cal. Rules of Court, rule 29(b)(2).) Empty brackets [] indicate deletions from the Court of Appeal opinion; brackets with material enclosed (other than parallel citations) denote insertions or additions by this court.

[2][Elsewhere in its opinion, the Court of Appeal stated that "Musser hired Provencher to assist with the bankruptcy aspect of the case . . . ." However, in oral argument before this court, counsel for Musser and for Provencher agreed that Provencher had been retained directly by the client Pam Scott.]

the violation of the automatic stay. Musser again requested Provencher and his insurer to contribute to a settlement but was again refused. Musser then amended her cross-complaint against Provencher to allege these additional damages, and settled with Mark Scott.

The settlements paid to Pam and Mark Scott included $85,000 ($10,000 of which was paid directly by Musser as her insurance policy deductible) and $20,000 in waived legal fees and costs. In addition, Musser and her insurer, Home Insurance Company (hereafter Home), spent $62,000 in defending both malpractice actions. [Fn. omitted.]

Musser's "First Amended Cross-Complaint for Indemnity" against Provencher alleged three causes of action: implied contractual indemnity, equitable indemnity, and "tort of another." The first two sought as damages the money paid by Musser and Home and the $20,000 in waived fees and costs. [Fn. omitted.] The tort of another cause of action sought $62,000 expended in defending the malpractice actions. Provencher answered, raising several affirmative defenses, including that Musser had violated Code of Civil Procedure section 389 in failing to join Home as a party, since Home paid all but the $10,000 deductible toward the settlement, and that Musser had split her cause of action for waived fees because Musser had failed to name Provencher in her cross-complaint against Pam Scott for fees. He also raised statute of limitations defenses. In November 1997, Musser moved for summary adjudication as to several of Provencher's affirmative defenses. After hearing, Judge Gary W. Thomas ruled that Home was "in essence" a party to the action, and was authorized to sue in Musser's name; that Musser had not split her cause of action, as the same cause of action was not involved in Musser's fee action against Pam Scott [as in] her indemnity action against Provencher. The court also ruled that the action against Provencher was not barred by res judicata or collateral estoppel for the same reason. The judge also ruled in favor of Musser on the statute of limitations issue, finding the indemnity causes of action within the limitations period and that the "tort of another" cause of action was for malpractice, the statute of limitations for which was triggered by discovery so that triable issues of fact remained as to when Musser discovered her actual harm.

By January 1999, Provencher was represented by new counsel and the case had been transferred to a new trial judge. In pretrial motions in limine, Provencher moved to bar Musser from seeking damages based on the settlements because Home, and not Musser, had paid the settlements. Provencher also urged that Musser had waived her claim for fees in the settlement and that the dismissal with prejudice following settlement barred Musser's fee and cost claim. Finally, he argued that the action was in reality a legal malpractice action which could not be assigned to Home. Musser

argued these issues had been decided in the summary adjudication motion and that the new motion was therefore an impermissible motion for reconsideration, made without new law or facts.

Judge Vernon F. Smith ruled that the action was in fact a legal malpractice claim, which could not be assigned to the insurer. Therefore, Musser could not introduce evidence of the settlements paid by Home. Judge Smith further found that Musser could not introduce evidence of fees and costs she had waived when she settled with Pam Scott and that the dismissal with prejudice following the settlement included those waived fees and costs. These rulings effectively struck all damage claims, except for the $10,000 deductible paid by Musser personally. Thereafter, on April 29, 1999, the trial court granted a motion for nonsuit as to the $10,000 deductible claim, preventing that damage claim from being presented to the jury. On October 26, 1999, following its grant of nonsuit on all Musser's claims, the court entered judgment against Musser and in favor of Provencher on Musser's cross-complaint. This timely appeal followed.

[The Court of Appeal reversed the judgment and remanded the matter for further proceedings. The court held Musser was not barred from seeking indemnification from Provencher. The court also held the trial court erred in ruling that Musser's malpractice insurer could not pursue a subrogation claim against Provencher. The court further held the trial court erred in dismissing that portion of Musser's action in which she sought recovery from Provencher of fees owed her by the client, notwithstanding Musser's settlement with the client. Finally, the court held the trial court erred in granting a nonsuit as to Musser's claim for the insurance policy deductible amount that she paid that was not subrogated or assigned to her malpractice insurer.]

## II.  DISCUSSION

Again, we consider two questions in this case. The central one is whether concurrent counsel or cocounsel should be permitted to sue one another for indemnification of legal malpractice damages. Assuming that, under the circumstances of this case, Musser should be permitted to sue her concurrent counsel, Provencher, for indemnification of malpractice damages, the question then arises whether Home, Musser's insurer, may be subrogated to her indemnity claim against Provencher. We turn, first, to the indemnification question.

A.  *Whether Concurrent Counsel or Cocounsel May Sue One Another for Indemnification of Malpractice Damages*

In *American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899] (*AMA*), this court held that, in general, one

cotortfeasor may obtain partial equitable indemnity from another on a comparative fault basis. "[W]e concur with Dean Prosser's observation in a related context that '[t]here is obvious lack of sense and justice in a rule which permits the entire burden of a loss, for which two defendants were . . . unintentionally responsible, to be shouldered onto one alone, . . . while the latter goes scot free.' (Prosser, Law of Torts [(4th ed. 1971)] § 50, p. 307.) From the crude all-or-nothing rule of traditional indemnity doctrine, and the similarly inflexible per capita division of the narrowly circumscribed contribution statute, we have progressed to the more refined stage of permitting the jury to apportion liability in accordance with the tortfeasors' comparative fault. [¶] Accordingly, we hold that under the common law equitable indemnity doctrine a concurrent tortfeasor may obtain partial indemnity from cotortfeasors on a comparative fault basis." (*AMA*, at pp. 607-608.)

"Our decision in *AMA* expressly acknowledged 'a number of significant exceptions to th[e] general rule' of indemnity, including immunity for good faith settlements and exclusivity of workers' compensation. (*AMA, supra*, 20 Cal.3d at p. 607, fn. 9.) Indeed, at least one subsequent appellate court has concluded that '*AMA* makes not a rule of general application but a rule riddled with exceptions. Partial indemnity is permitted only in appropriate cases.' [Citations.] Thus, irrespective of the equities between or among multiple tortfeasors, the right is subject to qualification; and countervailing considerations may limit recovery. 'As suggested by Dean Prosser, the granting of indemnity in any situation represents a judicial choice of policy' [citation]; and courts have long recognized that 'the doctrine is not available where it would operate against public policy. [Citation.]' " (*Western Steamship Lines, Inc. v. San Pedro Peninsula Hospital* (1994) 8 Cal.4th 100, 109-110 [32 Cal.Rptr.2d 263, 876 P.2d 1062] (*Western Steamship*), fn. omitted.)

In the footnote in *Western Steamship* that supports the statement that "courts have long recognized that 'the doctrine [of equitable indemnity] is not available where it would operate against public policy,' " we listed, among others, several cases in which indemnification for malpractice was barred where a predecessor attorney was seeking indemnification from his successor. (*Western Steamship, supra*, 8 Cal.4th at p. 110 & fn. 7.) In such cases, which we will refer to as predecessor/successor cases, the California Courts of Appeal, with one much criticized exception, have barred indemnification. (See *Held v. Arant* (1977) 67 Cal.App.3d 748 [134 Cal.Rptr. 422] (*Held*); *Gibson, Dunn & Crutcher v. Superior Court* (1979) 94 Cal.App.3d 347 [156 Cal.Rptr. 326] (*Gibson, Dunn*); *Goldfisher v. Superior Court* (1982) 133 Cal.App.3d 12 [183 Cal.Rptr. 609] (*Goldfisher*); *Holland v. Thacher*

(1988) 199 Cal.App.3d 924 [245 Cal.Rptr. 247] (*Holland*); *Austin v. Superior Court* (1999) 72 Cal.App.4th 1126 [85 Cal.Rptr.2d 644]; but see *Parker v. Morton* (1981) 117 Cal.App.3d 751 [173 Cal.Rptr. 197].)

The Courts of Appeal have given various reasons for barring indemnification in predecessor/successor cases, and they have not always explained their reasoning fully, but an examination of their opinions reveals two fundamental policy considerations. The first policy consideration is *avoiding conflicts of interest* between attorney and client: The threat of an indemnification action would arguably create a conflict of interest between the successor attorney and the client because the greater the award the successor attorney managed to obtain for the client in the malpractice action, the greater the exposure to the predecessor attorney in the indemnification action. (See, e.g., *Held, supra*, 67 Cal.App.3d at p. 752.) The second policy consideration is *protecting confidentiality* of attorney-client communications: In order to defend against an indemnification action, the successor attorney might be tempted to compromise the confidentiality of communications with the client. (See, e.g., *Goldfisher, supra*, 133 Cal.App.3d at p. 22.)[3]

The question we must consider, therefore, is whether allowing equitable indemnity would be contrary to public policy when one concurrent counsel or cocounsel sues another.

Claims made by concurrent counsel or cocounsel against one another for damages arising from their joint representation of a mutual client have been the subject of four published opinions by the Court of Appeal.

Equitable indemnity was the theory upon which relief was sought in two of the four cases, and in both of those cases relief was barred. (*Kroll & Tract v. Paris & Paris* (1999) 72 Cal.App.4th 1537 [86 Cal.Rptr.2d 78] (*Kroll & Tract*); *Shaffery v. Wilson, Elser, Moskowitz, Edelman & Dicker* (2000) 82 Cal.App.4th 768 [98 Cal.Rptr.2d 419] (*Shaffery*).)

Breach of fiduciary duty was the theory in the other two cases. (*Joseph A. Saunders, P.C. v. Weissburg & Aronson* (1999) 74 Cal.App.4th 869 [87

[3]A third policy consideration identified by some courts is *protecting the right of clients freely to choose their attorneys*: The threat of an indemnification action might deter the successor attorney from representing the client in the malpractice action because the successor attorney would be handicapped in defending against the indemnification claim by his duty to maintain the confidentiality of the client communications. (See, e.g., *Holland, supra*, 199 Cal.App.3d at pp. 930-931.) However, the few courts that invoked this policy did not accord it as much weight as the other two policies. (See *id.* at p. 930 ["may not be a controlling consideration"]; *Gibson, Dunn, supra*, 94 Cal.App.3d at p. 352 [not "controlling"; of "secondary importance"].)

Cal.Rptr.2d 405]; *Pollack v. Lytle* (1981) 120 Cal.App.3d 931 [175 Cal.Rptr. 81].) In those two cases, the underlying premise—that concurrent counsel or cocounsel owe one another a fiduciary duty not to handle their mutual client's case in such a way as to reduce or eliminate their anticipated attorney fees—was accepted by one court (*Pollack*) and rejected by the other (*Saunders*).

In a companion case, *Beck v. Wecht* (2002) 28 Cal.4th 289 [121 Cal.Rptr.2d 384, 48 P.3d 417], we consider the latter question—whether one concurrent counsel or cocounsel may sue another for *breach of fiduciary duty* on the theory that the latter's malpractice in handling their mutual client's case reduced or eliminated the fees the former expected to realize from the representation. In this case, we will confine ourselves to the question whether concurrent counsel or cocounsel may sue one another for *indemnification* of malpractice damages.

In *Kroll & Tract, supra,* 72 Cal.App.4th 1537, the client, who had been jointly represented by insurance counsel (Kroll & Tract) and *Cumis*[4] counsel (Paris & Paris), sued insurance counsel for malpractice, and insurance counsel cross-complained against *Cumis* counsel for equitable indemnity. Insurance counsel argued that the policy grounds on which equitable indemnity is barred in predecessor/successor cases were inapplicable because (1) the two lawyers had shared responsibility in the underlying action in which the client claimed the malpractice occurred and (2) neither of the lawyers was representing the client in the malpractice action. (*Kroll & Tract,* at p. 1542.) The Court of Appeal rejected the argument, although it suggested that the question whether a claim for equitable indemnity should be allowed in concurrent counsel or cocounsel cases should be decided by examining, on a case-by-case basis, whether the policy considerations for barring such a claim applied. (*Id.* at pp. 1542-1545.)

Under the facts presented in that case, the Court of Appeal held, the policy considerations for barring an indemnity claim did apply. (*Kroll & Tract, supra,* 72 Cal.App.4th at p. 1542.) Although the two counsel "shared the common goal of defending [the client] in the underlying lawsuit," the Court of Appeal observed, "they filled separate roles." (*Ibid.*) Kroll & Tract was hired by the insurer, who provided a defense under a reservation of rights, while Paris & Paris was the client's personal counsel and remained as *Cumis* counsel. "The insurance defense attorney is placed in a position of conflict . . . when issues of coverage are asserted by the insurer through a reservation of rights. Addressing this problem, the court in *San Diego Federal*

---

[4]See *San Diego Federal Credit Union v. Cumis Ins. Society, Inc.* (1984) 162 Cal.App.3d 358 [208 Cal.Rptr. 494, 50 A.L.R.4th 913] (*Cumis*).

*Credit Union v. Cumis Ins. Society, Inc., supra,* 162 Cal.App3d 358, held that an insurance company must pay for independent counsel for its insured when there are divergent interests of the insured and insurer brought about by the insurer's reservation of rights to deny coverage under an insurance policy. This holding was codified in Civil Code section 2860 in 1987. [¶] The *Cumis* doctrine requires 'complete independence of counsel' [citation], who represents 'solely the insured' [citation]. 'Since it is almost unavoidable that, in the course of investigating and preparing the insured's defense to the third party's action, the insured's attorney will come across information relevant to a coverage or similar issue, it is quite difficult for an attorney beholden to the insurer to represent the insured where the insurer is reserving its rights regarding coverage . . . .' [Citation.]" (*Kroll & Tract*, at pp. 1542-1543.) "[T]he issues of undivided loyalty, self-protective tendencies, and the preservation of the attorney-client privilege," the *Kroll & Tract* court concluded, "remain under these circumstances." (*Id.* at p. 1542.)

The *Kroll & Tract* court then contrasted concurrent representation cases with *Crouse v. Brobeck, Phleger & Harrison* (1998) 67 Cal.App.4th 1509 [80 Cal.Rptr.2d 94] (*Crouse*), a case in which the policy considerations barring indemnification in predecessor/successor cases were held inapplicable to an indemnity claim by a successor attorney against his predecessor. (*Kroll & Tract, supra,* 72 Cal.App.4th at p. 1544, fn. 4.) The *Crouse* court had found that "[t]he former attorney is not subject to any conflict of interest and has no continuing privileged communications or work product to protect." (*Crouse,* at pp. 1545-1546.) The *Kroll & Tract* court entered a reservation: "We are not prepared to agree with the *Crouse* court's sweeping statement for all purposes." (*Kroll & Tract,* at p. 1544, fn. 4.) However, *Kroll & Tract* continued, "the particular facts in *Crouse* showed there were no conflicting duties during the former attorney's representation of the dissatisfied client; thus, the court's result was correct." (*Ibid.*)

With regard to concern that allowing the cross-complaint might lead to breach of client confidences, Kroll & Tract contended the commencement of the malpractice action as to one attorney operated as a waiver of the privilege as to both attorneys regarding communications relevant to the joint representation. "But that," the Court of Appeal observed, "is not the law. The client is the holder of the attorney-client privilege (Evid. Code, § 952), and [the client] expressly preserved the privilege as to Paris & Paris by choosing not to sue it for malpractice. [Citation.] If the indemnity action were allowed, Paris & Paris would be unable to defend itself to the extent that its actions depended on client communications." (*Kroll & Tract, supra,* 72 Cal.App.4th at p. 1544.) "Where there is doubt about [the application of the attorney-client privilege], we will construe it liberally. [Citation.]" (*Id.* at p. 1545.)

In *Shaffery, supra,* 82 Cal.App.4th 768, an insurer filed a malpractice action against an attorney whom the insurer had hired to represent the insured in an employee's action brought against the insured for sexual harassment, and the attorney filed a cross-complaint for equitable indemnity against the law firm hired by the insurer to act as monitoring counsel in the underlying action. After reviewing the cases, the Court of Appeal barred indemnity. "In substance if not in form, we find the case before us analytically indistinguishable from [*Kroll & Tract*], and conclude the result must be the same." (*Shaffery,* at p. 778.)

The Court of Appeal here agreed with the suggestion made in *Kroll & Tract* that the question whether a claim for indemnity is allowable in concurrent counsel or cocounsel cases should be decided on a case-by-case basis (*Kroll & Tract, supra,* 72 Cal.App.4th at pp. 1542-1545), and the court concluded that the public policy considerations underlying the majority rule barring indemnification in predecessor/successor cases are not implicated by the facts of this particular case. We agree with the Court of Appeal on both points.

■ Again, one of the two policy considerations that led courts to prohibit indemnification claims brought by a predecessor attorney against a successor attorney was that such a claim could create a conflict of interest for the client's new attorney. The conflict of interest we are concerned about is not a conflict between an attorney's duty to the client and the attorney's purported duty to concurrent counsel or cocounsel, as we make clear in the companion case, *Beck v. Wecht, supra,* 28 Cal.4th 289. Rather, the conflict of concern is a conflict between an attorney's duty to the client and the attorney's *self*-interest. Provencher gives us no reason, and we have not discovered any reason ourselves, to believe that an attorney's self-interest will interfere with loyalty to the client just because the attorney, as a joint tortfeasor, may face an indemnification claim if the client sues the attorney's concurrent counsel or cocounsel for malpractice.

The other relevant policy is protecting the confidentiality of attorney-client communications. The concern is that the law firm from which indemnification is sought may be unable to defend itself without revealing privileged client communications. (*Kroll & Tract, supra,* 72 Cal.App.4th at p. 1544.) In *Kroll & Tract,* the Court of Appeal held that by choosing not to sue the law firm that was the subject of the indemnification claim, the client "expressly preserved the privilege" as to that firm. (*Ibid.*) That is not true in this case. As the Court of Appeal observed, Pam Scott, in her settlement with Musser, expressly waived her attorney-client privilege with respect to Provencher's representation of her in the bankruptcy portion of the dissolution action.

In conclusion, because the policy considerations that underlie the rule barring indemnification claims in predecessor/successor cases do not obtain in this concurrent counsel case, it would be unjust to deny Musser an opportunity to seek indemnity or contribution from Provencher when Musser has been sued by Pam Scott for damages allegedly attributable to Provencher's tortious conduct.

B. *Whether Home, Musser's Insurer, May Be Subrogated to Her Indemnity Claim Against Provencher*

The trial court ruled against Home on the ground that legal malpractice claims are not assignable (1 Mallen & Smith, Legal Malpractice (5th ed. 2000) Insurance Counsel, § 7.12, pp. 720-721, and cases cited at fn. 12) and that subrogation is an implied assignment (*Fifield Manor v. Finston* (1960) 54 Cal.2d 632, 640 [7 Cal.Rptr. 377, 354 P.2d 1073, 78 A.L.R.2d 813]).

■ While conceding that legal malpractice claims are generally not assignable in this state, the Court of Appeal found this case distinguishable on the ground that the insurer "is not seeking to succeed to the rights of the *client* against counsel, but to its insured attorney's right to seek indemnity from counsel for the proportional fault of the latter." "The rule against assignability and subrogation of legal malpractice actions," the Court of Appeal concluded, "should be contained by the context in which the rule arose—that of a third party (including the client's insurer) *attempting to succeed to the client's legal malpractice action against the client's former attorney.*"

We agree. As the Court of Appeal pointed out, *Goodley v. Wank & Wank, Inc.* (1976) 62 Cal.App.3d 389 [133 Cal.Rptr. 83] (*Goodley*) "is the seminal case which articulates the policy considerations underlying the rule [against the assignment of legal malpractice actions], which relate to the uniquely personal nature of the attorney-client relationship."

In *Goodley*, the defendant attorneys allegedly committed malpractice in a divorce case, their client assigned her malpractice claim to the plaintiff, and "[t]he crux of the issue" before the Court of Appeal was "whether a cause of action for legal malpractice is assignable." (*Goodley, supra,* 62 Cal.App.3d at p. 393, fn. omitted.) Important policy reasons, the *Goodley* court held, dictated against assignment of the client's malpractice claim. "It is the unique quality of legal services, the personal nature of the attorney's duty to the client and the confidentiality of the attorney-client relationship that invoke public policy considerations in our conclusion that malpractice claims should not be subject to assignment." (*Id.* at p. 397.)

" '*Goodley* noted the attorney owes a duty of undivided loyalty and diligence in representing the client. Such duty is personally owed by the attorney and may not be delegated to others, and is owed solely to the client, [the attorney's] one intended beneficiary. Assignability would encourage commercialization of claims, and would force attorneys to defend themselves against persons to whom no duty was ever owed. Moreover, the legal profession is debased by such commercialization, because it could (1) encourage unjustified lawsuits; (2) generate increased malpractice lawsuits, burdening the profession, the court system and (to the extent malpractice premiums would inevitably rise and be passed to the consumers) the public; and (3) promote champerty. [Citation.] Assignability could conceivably reduce the public's access to legal services, since the ever present threat of assignment by irresponsible clients (seeking quick financial gain) could cause lawyers to evaluate more selectively the desirability of representing a particular client. [Citation.]' (*Kracht* v. *Perrin, Gartland & Doyle* [(1990)] 219 Cal.App.3d [1019,] 1023-1024 [268 Cal.Rptr. 637].)" (*Fireman's Fund Ins. Co.* v. *McDonald, Hecht & Solberg* (1994) 30 Cal.App.4th 1373, 1379 [36 Cal.Rptr.2d 424] (*Fireman's Fund*).)

"The policy considerations underlying the *Goodley* decision usually have been persuasive for the courts that have considered the issue." (1 Mallen & Smith, *supra*, Insurance Counsel, § 7.12, p. 720, fn. omitted.)

As the Court of Appeal here observed, "The foregoing policy concerns underpin the rule prohibiting a third party from succeeding to *the client's* cause of action for legal malpractice against his or her former attorney. They have no application here, where the insurer is not seeking to succeed to the rights of the *client* against counsel, but to its insured attorney's right to seek indemnity from [concurrent counsel] for the proportionate fault of the latter."

Provencher relies upon *Fireman's Fund, supra*, 30 Cal.App.4th 1373, in support of his argument that the rule against subrogation of legal malpractice claims applies here. In *Fireman's Fund,* insurers paid more than $10 million to settle a lawsuit against their developer insureds by homeowners alleging misrepresentations in the sales of residential units. The developer insureds then filed a legal malpractice case against their attorneys for causing those representations to be made. Later, the insurers joined the malpractice lawsuit as plaintiffs under a theory of subrogation. (*Id.* at p. 1376.) The Court of Appeal affirmed the dismissal of the insurers as plaintiffs, holding that legal malpractice claims are not assignable or subject to subrogation absent express statutory authorization. (*Id.* at p. 1384.)

The insurer subrogee argued that its "interests were 'aligned' or 'virtually identical' with (and indeed 'derivative' of) the [insured client's] interests

against the attorney." (*Fireman's Fund, supra,* 30 Cal.App.4th at p. 1380.) Acknowledging that the insurer's policy arguments "have substance," the *Fireman's Fund* court nevertheless pointed out that the prohibition on assignment was " 'well settled' " (*id.* at p. 1381) and explained that "we are not the proper tribunal to depart from established law" (*id.* at p. 1380). "California courts have consistently held legal malpractice claims are nonassignable to protect the integrity of the uniquely personal and confidential attorney-client relationship. [Citations.] Further, under principles of stare decisis we are bound to follow the Supreme Court's holding in *Fifield Manor* v. *Finston, supra,* 54 Cal.2d 632, that absent express statutory authorization nonassignable claims are not subject to subrogation. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)" (*Fireman's Fund,* at p. 1383, fn. omitted.)

As the Court of Appeal here observed, however, the "critical distinction from *Fireman's Fund* is that Musser (the party to whose rights Home is subrogating) is not the client."

In summary, the policy considerations underlying the rule against assignment and subrogation of legal malpractice claims do not obtain in this case, where the subrogor is not the client, but the defendant attorney held liable to the client for negligence at least partially attributable to concurrent counsel.

### III. DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

**KENNARD, J.,** Concurring.—I agree with these two holdings by the majority: (1) There is no legal barrier precluding concurrent counsel or cocounsel from suing one another for indemnification of damages incurred in a legal malpractice action, and (2) the insurer of the attorney sued for legal malpractice may be subrogated to the attorney's indemnity claims against concurrent counsel or cocounsel.

I express no view, however, on the scope of indemnity between predecessor and successor counsel (see maj. opn., *ante,* at pp. 280-281) because that is not an issue in this case. Nor do I express a view on whether a client suing one of the client's attorneys but not the other has waived the attorney-client privilege as to both attorneys or only as to the attorney being sued. (*Id.* at pp. 283-284.) This issue too is not presented here. I would leave resolution

of these difficult questions for another day when, having been properly raised, they require resolution.

Baxter, J., concurred.

**BROWN, J.,** Concurring.—I agree, of course, that the considerations of public policy that have led a majority of the Courts of Appeal to bar indemnification claims in the predecessor/successor cases—*avoiding conflicts of interest between attorney and client* and *protecting the confidentiality of attorney-client communications*—do not require the adoption of a blanket rule barring indemnification claims in cocounsel cases. However, out of a concern for *judicial economy*, I would have preferred to have adopted such a blanket rule.

The case-by-case approach, which we adopt in the majority opinion, may result in more justice for lawyers, but less for the general public, because we will continue to squander scarce judicial resources, at both the trial and appellate level, on these cases. The exorbitant number of published Court of Appeal opinions devoted to them was tallied in a puckish footnote by Justice Miriam A. Vogel. "This opinion, our fourth, means we now have the lead for the number of published opinions on this issue. Division One of the Fourth District is second with three published opinions. Division Three of the Fourth District is third with two published opinions. Divisions Two, Four and Seven of our District, Division Two of the Fourth District, and Divisions Two and Three of the First District, are all tied for fourth place with one opinion each. We like to keep track of these things." (*Shaffery v. Wilson, Elser, Moskowitz, Edelman & Dicker* (2000) 82 Cal.App.4th 768, 778, fn. 2 [98 Cal.Rptr.2d 419].) What will now be the critical issue in cocounsel cases where indemnification is sought for malpractice damages—whether the policy of protecting attorney-client confidentiality would be served by barring indemnification under the circumstances of the particular case—is so fact-bound that minitrials will be required, the losing party will always appeal, and the resulting appellate decisions will provide little guidance. The one certainty is that the adoption of the case-by-case approach will afford other divisions of the Court of Appeal ample opportunity to overtake Division One of the Second District in the race for the number of published opinions devoted to these questions.

Respondents' petition for a rehearing was denied August 14, 2002.